# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| RACHEL FRASER, | * | |
| Plaintiff, | * | |
|  | * | |
| v. | * | Civil No. 21-3276-BAH |
| KAISER FOUNDATION HEALTH PLAN | * | |
| OF THE MID-ATLANTIC STATES, INC.,[1] | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Rachel Fraser ("Plaintiff" or "Fraser") brought suit against Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. ("Defendant" or "Kaiser") alleging discrimination in violation of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Rehabilitation Act") (count I), retaliation in violation of the ADA[2] (count II), and hostile work environment under the ADA (count III). ECF 1. Pending before the Court is Kaiser's motion for summary judgment (the "motion"). ECF 27. Plaintiff filed an opposition, ECF 30, and Kaiser

---

[1] While the complaint names the defendant as "Kaiser Permanente," Kaiser has repeatedly highlighted that the proper defendant is "Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc." *See* ECF 8 (answer), at 1 n.1; ECF 27-2, at 1 n.1; ECF 31, at 1 n.1. Plaintiff has not acknowledged these clarifications. The Clerk will be directed to correct the docket to reflect that the correct defendant is "Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.," not "Kaiser Permanente."

[2] While the complaint purports to bring this retaliation claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), it does not contain any allegations relating to a class protected by Title VII. *See generally* ECF 1. Counsel clarified during Plaintiff's deposition that the claim is actually brought under the ADA, not Title VII. *See* ECF 27-3, at 66. Both parties have referred to this claim as an ADA retaliation claim in the summary judgment briefing. *See* ECFs 27-2 and 30. As such, the Court will evaluate this retaliation claim under the ADA, not Title VII.

filed a reply, ECF 31. The motion includes a memorandum of law and exhibits, including excerpts and exhibits from Plaintiff's deposition, ECFs 27-3 through 27-5, the declaration of Janelle Day, a disability case manager at Kaiser, with additional exhibits, ECF 27-6, and the declaration of Artine Hollis, Plaintiff's supervisor, with additional exhibits, ECFs 27-7 through 27-9.[3] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Kaiser's motion is **GRANTED**.

## I.    **BACKGROUND**

The facts herein are taken from the evidence submitted by Kaiser along with its motion. Plaintiff has not disputed any of these facts and has not submitted any evidence with her opposition to the motion for summary judgment.[4]

Plaintiff was a sonographer at Kaiser's Largo, Maryland, location from 2009 until her termination in June 2020. ECF 27-3, at 8 (Plaintiff's deposition); ECF 27-5, at 64 (termination letter). Sonographers, also called radiology technicians, use specialized radiology machines and probes to conduct examinations of patients and obtain diagnostic information, including ultrasound images. *See* ECF 27-3, at 13; ECF 27-8, at 2–4 (job description for sonographer position). When sonographers perform an exam on a patient, they are to conduct a preliminary review of the images obtained, ensuring that they meet the radiologist's requirements (for example, to make sure they

---

[3] While the Court typically references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page, Kaiser's motion, proposed order, and memorandum in support, as well as Plaintiff's opposition and Kaiser's reply are not stamped by the ECF system. *See* ECFs 27, 27-1, 27-2, 30, and 31. When referring to these filings, therefore, the Court will cite to the page numbers provided by the parties. When referring to the exhibits, which can be found at ECFs 27-3 through 27-9 and *are* stamped by the ECF system, the Court will cite to the ECF-generated page numbers.

[4] In fact, Plaintiff's statement of facts in the opposition to the motion for summary judgment appears to be, word-for-word, the facts alleged in the complaint without paragraph numbering. *Compare* ECF 1, at 3–4 ¶¶ 11–23, *with* ECF 30, at 1–2.

are clear enough) and drawing any abnormalities or areas of concern to the reviewing radiologist's attention, who is often off-site and not at the same location as the sonographer. ECF 27-3, at 17–18; ECF 27-7, at 1 ¶ 2 (Hollis declaration); ECF 27-8, at 4. Sonographers are to follow standard protocols, including a step-by-step workflow, for each examination. *See* ECF 27-3, at 14–15; ECF 27-7, at 1 ¶ 1; ECF 27-8, at 105–64 (Kaiser Permanente Mid-Atlantic States Department of Radiology Diagnostic Ultrasound Protocol Manual updated as of September 2018); ECF 27-8, at 166–219 (Kaiser Permanente Mid-Atlantic States Department of Radiology Diagnostic Ultrasound Protocol Manual updated as of February 2019); ECF 27-8, at 26 (copy of "End-to-End Member Exam Workflow (Centricity and PACS)"). If a sonographer is unable to obtain a high enough quality image, they may have to redo the exam at a later date or bring in another sonographer to try to obtain the requisite images. ECF 27-3, at 17; ECF 27-7, at 1 ¶ 1. During Plaintiff's employment, off-site radiologists could and often did communicate with the sonographer performing an ultrasound through a chat system called PACS (Picture Archiving and Communication System), including while the exam was ongoing. ECF 27-3, at 18–19; ECF 27-8, at 50 (screenshot of 5/14/19 chat); ECF 27-8, at 62–63 (screenshots of 6/18/19 chat); ECF 27-8, at 68–69 (screenshots of 8/27/19 chat).

At all relevant times, Plaintiff's supervisor was Artine Hollis, who was a radiology supervisor. ECF 27-3, at 8–9; ECF 27-7, at 1 ¶ 1. Towards the end of her employment, Plaintiff also worked under Kristen Carter, a modality manager in the radiology department. ECF 27-3, at 20; ECF 27-7, at 2 ¶ 3. Modality managers like Carter ensure compliance with protocols and perform quality assessments of sonographers' examinations if concern about a sonographer's images is raised by a reviewing radiologist. ECF 27-3, at 19–20; ECF 27-7, at 1–2 ¶ 2. During Plaintiff's employment, these quality assessments entailed comparing images obtained by a

sonographer to the end-to-end workflow and notifying the sonographer about issues and errors identified. ECF 27-3, at 19–20; ECF 27-7, at 1–2 ¶ 2. Carter would often communicate with Hollis about any quality assessments. ECF 27-7, at 2 ¶ 3.

Plaintiff was injured in 2013 and subsequently requested to use a footstool at work, which Hollis approved. ECF 27-3, at 23–24. In October 2014, she was injured at work when trying to help move a wheelchair-using patient through a doorway. ECF 27-3, at 25–27; ECF 27-4, at 53–54 (Employee Occupational Injury and Illness Report). She received treatment for that injury in October and December of that year, submitting verification of treatment forms. ECF 27-3, at 31–32; ECF 27-4, at 56–58. At Kaiser, all Family and Medical Leave Act ("FMLA") requests are processed through the national Human Resources ("HR") Service Center. ECF 27-3, at 33; ECF 27-7, at 2 ¶ 4. Plaintiff testified that she received requests to recertify her FMLA leave, which Plaintiff attributed in her deposition to Hollis, but also acknowledged they may have come from the HR Service Center. ECF 27-3, at 38–39. Plaintiff also testified that Hollis would ask Plaintiff "questions about treatment and regarding . . . how [the treatment was] assisting [Plaintiff] to basically continue [to do her] job." *Id.* at 76–77.

Around this time, Plaintiff asserts that Hollis began writing Plaintiff up, *id.* at 37, though she also admits she had previously been written up for "time and attendance," *id.* at 40. Plaintiff acknowledges that the writeups did not explicitly say anything about her disability or other medical conditions, *id.* at 37–39, but the substance of these writeups is not otherwise clear from the record. Plaintiff testified that she spoke with a union representative about Hollis's "treatment toward [Plaintiff]" and that she "fe[lt] targeted . . . ever since [she was] injured" and that Plaintiff "fe[lt] as though [Hollis] ha[d] been just finding ways to write [Plaintiff] up for things that happen in [the radiology] department with other techs as well." *Id.* at 41. Plaintiff testified that she "d[idn't]

4

know if this [wa]s coming from settling out of court" on a workers' compensation claim Plaintiff had filed "[b]ecause [she] felt like it became more frequent after [she] settled out of court."[5]  *Id.* at 42.  Beyond the questions about how Plaintiff's treatment helped her injuries, at her deposition, Plaintiff did not remember any other instances of Hollis commenting on Plaintiff's injuries or disability.  *Id.* at 77.

Around December 2014, Kaiser began updating its ultrasound machines to the Aplio 500.  *Id.* at 43–44; ECF 27-4, at 157–58 (letter to Plaintiff dated March 30, 2016, from a disability case manager in Kaiser's Integrated Disability Management ("IDM") department).  Representatives from the machine's manufacturer worked with sonographers and held training sessions to help them get acquainted with the new machines.  ECF 27-3, at 43–44; ECF 27-4, at 157–58.  After Plaintiff and other sonographers raised concerns about the ergonomics of the machine, Kaiser held an ergonomic assessment on January 20, 2015, to try to remedy the sonographers' complaints.  ECF 27-4, at 156 ("Ergonomic Assessment – Aplio 500"); *id.* at 157–58.  Even after Kaiser implemented some changes to the machine, Plaintiff still felt pain when using it.  *Id.* at 157–58.  As such, to accommodate Plaintiff, Kaiser assigned her to a "Transitional Work Program" ("TWP") where she would perform administrative tasks that did not require the use of the Aplio 500.  *Id.*  A March 30, 2016 letter to Plaintiff from IDM noted that Plaintiff returned to her home radiology department in March 2015 "as there was no documented medical limitation prohibiting [her] from returning to [her] home department and all of the essential functions of [her] position."  *Id.* at 158.  The record indicates that in April 2016, Plaintiff was transferred to Employee Health, apparently on another TWP due to her home department's continued use of the Aplio 500

---

[5] It is unclear from the record when Plaintiff submitted or settled her workers' compensation claim, as is the timing of Plaintiff's conversation with her union representative and her complaints about Hollis.

machines. *See id.* at 159 (October 6, 2016 email from Plaintiff noting that she "ha[s] been in Employee Health since April on an IDM assignment due to being injured at work"); ECF 27-6, at 1 ¶ 4 (Day declaration).

In October 2016, Kaiser transitioned away from the Aplio 500. ECF 27-3, at 45; ECF 27-4, at 159; ECF 27-6, at 1–2 ¶ 5. Kaiser IDM employees reached out to Plaintiff to notify her that since her home department was replacing the Aplio 500s, it did not have documentation to corroborate that she needed to remain on the TWP and that she could return to the Largo radiology department as a sonographer. ECF 27-4, at 161 (October 7, 2016 email from Day to Plaintiff and others); *id.* at 182 (October 11, 2016 email from Day to Plaintiff noting that the new machines "w[ould] not be up and running until Monday 10/17/2016" so her TWP would continue until Friday, October 14 and she would transition back to her home department when the new machines were installed); ECF 27-6, at 2 ¶ 6. Plaintiff acknowledged she could return but requested that she be assigned to a different shift where there would be more sonographers working at a time so as to ease her back into the department and provide more rest between patients. ECF 27-3, at 45–46; ECF 27-4, at 159–60. Janelle Day, of IDM, informed Plaintiff how to submit a reasonable accommodation request. ECF 27-4, at 162–63 (October 7, 2016 email from Day to Plaintiff and others). On October 11, 2016, Plaintiff submitted two doctor's notes, one recommending that she be afforded a five-to-ten-minute break for every fifteen to thirty minutes of scanning, *id.* at 171–75 (Healthcare Provider Assessment by Dr. Harris), and the other recommending that she take a ten minute break between patients, *id.* at 176–80 (Healthcare Provider Assessment by Dr. Logan). On November 7, Plaintiff's shift request was denied, but Kaiser offered to break up her normal one-hour break into two fifteen minute and one half-hour long breaks. ECF 27-3, at 46; ECF 27-4, at 185–86 (November 7, 2016 email from Day to Plaintiff and others). Plaintiff rejected this

proposal but does not remember how the situation was resolved.[6] ECF 27-3, at 51–52; ECF 27-4, at 185 (November 7, 2016 email from Plaintiff to Day and others). At the end of 2016, two years after her injury, Plaintiff still had difficulty pushing hard enough on a patient's body to obtain ultrasound images, particularly when scanning obese patients.[7] ECF 27-3, at 28–29. Plaintiff was approved for intermittent FMLA leave from January 2016 through January 2017, ECF 27-8, at 7–8, and from Feb 2018 through January 2019, *id.* at 19–21.[8]

Pursuant to a collective bargaining agreement, Kaiser's employee discipline procedures are comprised of a five level "corrective action" process:

### 3.3 CORRECTIVE ACTION

Corrective action is a method of resolving performance and behavior issues in a nonpunitive fashion in which employee, supervisor, and shop steward(s) work together to identify the problem and craft the solution. Levels one and two are problem-solving levels. Level three is considered to be the first level of discipline and goes into the personnel file. Level four is the day of decision (last chance agreement). Level five is termination. Any levels one through four may be repeated. Each level shall state the reasons for the action and specify the agreements reached.

ECF 27-5, at 75 (arbitration decision quoting collective bargaining agreement).

On October 13, 2017, February 15, 2018, and August 24, 2018, Plaintiff received Level 1, Level 2, and Level 3 corrective actions, respectively, for not following the proper workflow during ultrasound examinations, which resulted in delays. ECF 27-7, at 3 ¶ 6; ECF 27-8, at 23–24 (October 13, 2017 Level 1 corrective action); ECF 27-8, at 28–30 (February 15, 2018 Level 2

---

[6] Plaintiff does not allege that Kaiser failed to accommodate her disability at any time. *See generally* ECF 1.

[7] While Plaintiff testified that her condition resulting from the 2014 workplace incident "worsened and [that she is] now diagnosed with sciatica," ECF 27-3, at 25, it is not clear from the record when this diagnosis was made.

[8] Plaintiff continued to take intermittent FMLA leave up through April 2020. *See* 27-4, at 149. While approval documents for this time period to not appear to be in the record before the Court, Defendant does not challenge Plaintiff's entitlement to that leave.

7

corrective action); ECF 27-8, at 32–33 (August 24, 2018 Level 3 corrective action); ECF 27-8, at 44–46 (April 2, 2019 email from Kristen Carter to Plaintiff, Hollis and others regarding failure to verify patient information and requesting reconciliation in the PACS system). On April 9, 2019, she received a Level 1 corrective action for "unprofessional attitude and communication toward the [r]adiologist." ECF 27-8, at 35–36; *see also* ECF 27-7, at 3 ¶ 6. On May 13, 2019, she received a repeat Level 3 corrective action for failure to follow proper workflow, failure to verify patient information, and failure to properly submit reconciliation forms. ECF 27-7, at 3 ¶ 7; ECF 27-8, at 38.

On May 14, 2019, Plaintiff conducted an obstetrics ("OB") examination that resulted in a quality assessment with Carter. ECF 27-8, at 50–53. The radiologist had noted concern about the quality of Plaintiff's work and her adherence to the workflow during the exam based on an incomplete exam, "[s]ignificant gaps of time without images or evidence of active scanning," "difficulty acquiring protocol images," and Plaintiff's failure to "enlist help of team member until instructed to do so by reading radiologist." *Id.* at 50. The quality assessment notes similar issues with Plaintiff's initial exam of this same patient a few weeks prior. *Id.* at 51. Carter shared the details of this quality assessment with Hollis. ECF 27-7, at 4 ¶ 8.

On May 20, Plaintiff performed a follow-up examination for a patient for whom she had completed the initial exam, and this exam was also subject to a quality assessment. *Id.* ¶ 9. The radiologist noted that Plaintiff did not complete 3 of 6 items she should have, "resisted asking for team member to second when she was unable to capture all required images," and captured "[s]uboptimal documentation." ECF 27-8, at 55–57. The quality assessment notes that Plaintiff "is frequently confrontational with radiologists when asked to produce additional images or follow standard workflow guidelines, to the detriment of patient care and exam quality." *Id.* at 55. The

8

assessment also notes that during the initial exam of this patient performed weeks prior, Plaintiff had also failed to capture all the required images and failed to call a second sonographer for help achieving these images. *Id.* at 57–58.

The same day, Plaintiff conducted another exam on another patient to assess the patient's placenta previa which also resulted in a quality assessment with Carter (and later shared with Hollis). ECF 27-2, at 4 ¶ 10. The radiologist noted that during this exam Plaintiff failed to follow standard protocol, that she only performed an exam at the direction of the radiologist, that the exam was "poorly executed," that Plaintiff did not leave impression notes, that required images were either suboptimal or missing altogether, and that Plaintiff was again reluctant to ask for help. ECF 27-8, at 72–73. "[T]o document so poorly," the quality assessment describes, demonstrates "[n]ot only blatant disregard for protocol, but also for patient safety in a [patient] with known placenta previa." *Id.* at 72.

In the summer of 2019, Plaintiff sent several emails complaining about radiologists, naming specifically Dr. Galper and Dr. Harris, as well as about difficulties performing exams and working with the radiologists. On May 21, 2019, Plaintiff sent an email to Hollis complaining about an interaction she had had earlier that morning with Dr. Galper. ECF 27-8, at 75–76. Plaintiff wrote:

> Just now I assisted [another sonographer] in locating the area of concern for her. Dr. Galper went in the room and requested assistance from another technologist. I went in again to assist and she looked at me up and down and told me "I think we are alright" I smiled and said 'ok' and exited the room. She then asked for a technologist other than me to assist her that is more experienced. This is disgusting and very unprofessional behavior by a provider.

*Id.* at 76. Hollis spoke with Dr. Galper about the incident and responded to Plaintiff that her concerns had been passed along to supervisors, and that all staff were expected to act professionally towards one another. ECF 27-7, at 5 ¶ 12; ECF 27-8, at 75. On July 26, 2019, Plaintiff emailed

9

Carter and others asking that sonographers get more time to complete patient exams. ECF 27-8, at 78. She also noted that she took issue with radiologists apparently thinking that sonographers were not skilled enough and their requesting that specific sonographers conduct their examinations. *Id.* It is not clear from the record if anything ever came of this email. On August 8, 2019, Plaintiff complained to Hollis via email about Dr. Harrison's "tone" during an exam, which Plaintiff took to mean that she "wasn't providing him with images he needed." *Id.* at 81. Dr. Harrison had also asked for another sonographer to step in and provide images that Plaintiff claimed she had already provided. *Id.*

In August 2019, Plaintiff conducted two examinations that resulted in quality assessments with Carter (which were both then shared with Hollis). ECF 27-7, at 5–6 ¶¶ 15–16. At the first, on August 13, Plaintiff was to complete an OB exam and assess the fetus's size, age, and anatomy. ECF 27-7, at 5 ¶ 15; ECF 27-8, at 83–87. The radiologist noted that the images Plaintiff captured were incomplete, she labeled the images poorly and failed to explain items she should have, and that the "suboptimal images [she took] [we]re too many to count." ECF 27-8, at 83. When the radiologist asked clarifying questions during the exam, Plaintiff did not respond. *Id.* The radiologist asked that a different sonographer perform the exam because Plaintiff was "very reluctant to ask for help." *Id.* On August 27, Plaintiff was to perform an ultrasound for a patient's left-side groin pain. *Id.* at 95–96. After she did not include certain images called for by routine protocol, the radiologist asked that another sonographer take new images. ECF 27-7, at 6 ¶ 16; ECF 27-8, at 95–96, 102–03. The second sonographer took more images, including of the area Plaintiff had missed, and identified a testicular torsion. ECF 27-7, at 6 ¶ 16; ECF 27-8, at 95–96. After the torsion was identified, the patient then obtained surgery to fix it before it led to the loss of all testicular function. ECF 27-7, at 6 ¶ 16.

Also on August 27, 2019, Dr. Ranganath, a radiologist, sent Carter and others an email summarizing the complaints of several radiologists about Plaintiff's performance on OB exams—citing nine examples of problematic exams (including problematic ultrasound images and screenshots of Plaintiff's problematic communications with radiologists during exams). ECF 27-8, at 60–69. Dr. Ranganath wrote:

> [Plaintiff] does not follow established protocols, she does not make corrections after being counseled, and she is reluctant to ask for help from others. Equally as important, we have received multiple complaints about her attitude and work ethic, and we have found her to be quite rude at times. She frequently complains about OB exams taking too long and straining the schedule, but she is unable or unwilling to recognize her own faults that contribute greatly to the delays she is experiencing with OB [ultrasound] exams. Working with her is time consuming and frustrating, and her actions and poor attitude are compromising patient safety and satisfaction.

*Id.* at 60. Dr. Ranganath concluded that:

> [Plaintiff] has yet to give me a completed anatomy scan all by herself. She consistently produces poor quality scans, and is not forthcoming regarding the missing items. [She] is not reliable and not safe for our patients as well as radiologists who read her exams. She has often complained that OB exams take too long. But she does not realize that everyone around her at Largo and countless other sonographers all over our centers are consistently producing well done complete scans in less than the allotted time.

*Id.* at 69 (emphasis in original). The Director of Imaging Compliance and Quality, an original recipient of the email, forwarded it to Hollis. ECF 27-7, at 7 ¶ 17; ECF 27-8, at 60.

On September 13, 2019, Plaintiff received two corrective actions—one Level 2 for communication issues with radiologists and one Level 4 for failure to follow protocol, workflow, radiologist instructions, and for consistently producing poor quality images. ECF 27-8, at 221–23 (Level 2 corrective action); *id.* at 225–31 (Level 4 corrective action).

On October 24, 2019, Plaintiff conducted a fetal survey which resulted in a quality assessment, which Carter reviewed with Plaintiff on December 2. ECF 27-9, at 2–7. The reviewing radiologist triggered the quality assessment because a number of the images were

11

"suboptimal," Plaintiff had not noted the fetal sex (which is standard protocol), there were 54 minutes of gap time when scanning was not being conducted, and Plaintiff had communication issues with the radiologist. *Id.* Carter shared the documents related to this quality assessment with Hollis. ECF 27-7, at 8 ¶ 20.

On January 28, 2020, Dr. Bandarkar, the ultrasound modality chief, conducted a training, attended by Plaintiff, about producing quality OB images. ECF 27-5, at 14–58. On February 13, 2020, Plaintiff conducted a fetal survey examination, where the initial images Plaintiff captured suggested that the fetus had clubfoot. ECF 27-9, at 16–21, 25. Plaintiff did not note the suggested abnormality in the exam notes as is required by standard protocols, but when the reviewing radiologist asked "was there a clubfoot?" Plaintiff responded with "[i]t appears so." *Id.* at 16, 21, 25. The radiologist had another sonographer perform more images, which ultimately demonstrated that the fetus did not have clubfoot and that the feet were normal. ECF 27-9, at 21, 25. Carter conducted quality assessment, noting that Plaintiff should have annotated the abnormalities she initially observed even if more images later proved there were no abnormalities, and shared it with Plaintiff and Hollis via email. ECF 27-7, at 8–9 ¶ 23; ECF 27-9, at 16–21.

At the urging of a radiologist and after consulting with radiology leadership, HR, and Carter, on March 10, 2020, Hollis communicated to Plaintiff that she would no longer perform OB ultrasounds. ECF 27-7, at 9–10 ¶ 24; ECF 27-9, at 29. Hollis confirmed via email sent at 9:18 AM that day that she and Plaintiff had had a meeting earlier that morning. ECF 27-9, at 29. The same morning, Plaintiff sought leave for a doctor's visit, which Hollis approved via email at 10:52 AM. *Id.* at 32. Shortly after noon, Plaintiff responded to the 9:18 AM email that she was confused, "was asked no questions and given no opportunity to understand where [the decision to remove her from OB exams was] coming from" and felt "targeted and harassed for doing [her] job." *Id.*

at 32. She said she "ha[d] very bad PTSD with the measures that were taken against [her] with the most recent incident with a testicular case." *Id.*

On May 19, 2020, Plaintiff was put on administrative leave, and on June 22, 2020, she was terminated. ECF 27-5, at 63 (administrative leave letter); *id.* at 64 (termination letter). The termination letter specifically references the October 24, 2019 and February 13, 2020 examinations as the basis for her termination. *Id.* at 64. Plaintiff filed a union grievance, which went to arbitration. *Id.* at 65–66 (grievance); *id.* at 74–89 (arbitration decision and award). The arbitrator found that Kaiser had just cause to terminate Plaintiff. *Id.* at 89. On August 20, Plaintiff filed a charge of discrimination with the Prince George's County Human Rights Commission alleging that Kaiser had discriminated against her on the basis of disability and retaliated against her. *Id.* at 67–68. On September 25, 2021, the EEOC issued Plaintiff a right-to-sue letter, *id.* at 71–73, and on December 24, 2021, she filed this action, ECF 1.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313

(4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.    **ANALYSIS**

As an initial matter, the Court notes that Plaintiff does not cite any record evidence in the response in opposition to summary judgment. Federal Rule of Civil Procedure 56(c) places the burden on the party responding to a motion for summary judgment to show that a fact is genuinely disputed by "citing to particular parts of materials in the record," or by "showing that the materials

cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Plaintiff has failed to cite to any part of the record to support her assertions or dispute Defendant's statement of facts. This alone is fatal to any argument that this case should proceed to trial, as Plaintiff has failed to proffer sufficient proof, in the form of admissible evidence, of disputed material facts. *See Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (stating that "plaintiffs need to present more than their own unsupported speculation and conclusory allegations" to survive a defendant's motion for summary judgment). The Court will now address whether Defendant is entitled to judgment as a matter of law on each of Plaintiff's three claims.

## A.    Plaintiff's Disability Discrimination Claim

The ADA prohibits employers from discriminating against otherwise "qualified individual[s] on the basis of disability." [9] 42 U.S.C. § 12112(a)–(b). A plaintiff alleging unlawful discrimination under the ADA must establish that she (1) is a "qualified individual with a disability"; (2) was "discharged"; (3) was "fulfilling [her] employer's legitimate expectations at the time of discharge"; and (4) the "circumstances of [her] discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (internal quotation marks omitted) (quoting *Rohan v. Networks Presentations LLC*, 375 F.3d 266,

---

[9] Plaintiff brought this discrimination claim under both the ADA and Rehabilitation Act. *See* ECF 1, at 4. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). While neither party references the Rehabilitation Act in the summary judgment briefing, the ADA and Rehabilitation Act "require a plaintiff to demonstrate the same elements to establish liability." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012). Thus, the Court's analysis is the same whether the claim is brought pursuant to the ADA or Rehabilitation Act.

273 n.9 (4th Cir. 2004)). Plaintiff must satisfy each of the above elements to survive summary judgment.

"When a plaintiff alleges that her employer unlawfully discriminated or retaliated against her in violation of the ADA, she can prove her claim through direct and indirect evidence. Otherwise, the plaintiff may proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Laird v. Fairfax Cnty.*, 978 F.3d 887, 892 (4th Cir. 2020) (citing *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572, 577 (4th Cir. 2015)). Under the *McDonnell Douglas* framework, a plaintiff must first make out "a prima facie case of discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *McDonnell Douglas Corp.*, 411 U.S. at 802–05. The burden then shifts to the employer, who must establish that there was "a legitimate, nondiscriminatory reason" for the adverse employment action. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves,* 530 U.S. at 142. If the employer discharges its burden, the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Id.* at 143 (quotations and citations omitted). Importantly, "[t]he ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Here, there is no dispute that Plaintiff was discharged in June 2020, and Defendant concedes that Plaintiff is a qualified individual with a disability. *See* ECF 27-2, at 18. Nevertheless, her ADA discrimination claim fails because she has not established the third and fourth elements to make a prima facie claim. Plaintiff has not established that she was meeting

16

the legitimate expectations of her employer at the time of termination, and she has not pointed to any evidence from which the Court could draw a reasonable inference of unlawful discrimination.

"The 'legitimate expectations' factor is distinct from the inquiry into the 'essential functions of a job.'" *Rubino v. New Acton Mobile Indus.*, 44 F. Supp. 3d 616, 623 (D. Md. 2014) (quoting *Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 61–62 (4th Cir. 1995)). The Fourth Circuit has clarified that courts "must focus on the employer's perception in the context of the *pretext* stage, [but it] 'ha[s] not so held with respect to a plaintiff's prima facie case." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021). At the prima face stage, a plaintiff employee must demonstrate that she was meeting her employer's legitimate expectations, *see Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514 (4th Cir. 2006), or at least "introduce 'evidence that demonstrates (or at least creates a question of fact) that the proffered "expectation" is not, in fact, legitimate at all.'" *Sempowich*, 19 F.4th at 650 (quoting *Warch*, 435 F.3d at 517). "Considering an employer's legitimate expectations comports with the purpose of requiring the establishment of a prima facie case—to screen out those cases whose facts give rise to an inference of nondiscrimination, in other words, to eliminate the most common, nondiscriminatory reasons for the employer's conduct." *Warch*, 435 F.3d at 514 (citing *Miles v. Dell*, 429 F.3d 480, 488 n. 5 (4th Cir. 2005)); *see also Burdine*, 450 U.S. at 253–54.

Plaintiff does not even allege in the complaint or suggest in her opposition (let alone point to evidence) that she was meeting the legitimate job performance expectations of Kaiser at the time of her termination. That alone is sufficient to find that Plaintiff has not established a prima facie case. *See Sempowich*, 19 F.4th at 650.

But it is also clear to the Court that the circumstances surrounding Plaintiff's termination do not give rise to a reasonable inference that she was terminated because of her disability. The

uncontroverted record is clear that between October 13, 2017, and September 13, 2019, Plaintiff received seven corrective actions: two Level 1s, two Level 2s, two Level 3s, and a Level 4. *See* ECF 27-8, at 23–24, 28–30, 32–33, 35–36, 38, 221–23, 225–31. All of these corrective actions pertained to Plaintiff's failure to follow routine protocols and communication issues between Plaintiff and radiologists. The record contains nine instances of quality assessments of exams Plaintiff performed—two of which also note issues with prior exams—between May 2019 and February 2020. *See* ECF 27-8, at 50–53, 55–57, 72–73, 83–87, 95–96, 102–03; ECF 27-9, at 2–7, 16–21, 25. And Dr. Ranganath's August 27, 2019 email suggests that there were others, leading multiple radiologists to alert leadership to the documented instances of her poor performance to the detriment of patient care and radiologists' ability to review patient exams. ECF 27-8, at 60–69. Plaintiff acknowledges that none of the corrective actions or quality assessments reference her disability. ECF 27-3, at 74–75.

While the evidence may support an inference that *some* of Plaintiff's actions deemed poor performance may be related to her difficulties pushing down hard enough to achieve the requisite quality ultrasound images, many of them, including her documented communication issues with radiologists, failure to follow standard workflows, failure to provide requisite comments regarding her observations during exams, and her failure to ask for help (per protocol), appear completely unrelated to her stated disability. Defendant has cited ample evidence showing that Plaintiff's ability to perform ultrasound exams was insufficient for at least a year preceding her termination. Plaintiff, on the other hand, offers only general assertions, citing only to the complaint and offering no evidence, that "the performance appraisals had a discriminatory undertone" and "were based on the underlying discrimination." ECF 30, at 4.

"To raise a reasonable inference of disability discrimination in a wrongful discharge case, an employee must allege that his disability was a 'but-for' cause of his termination." *Kelly v. Town of Abingdon*, 90 F.4th 158, 169 (4th Cir. 2024) (citing *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235–36 (4th Cir. 2016)). Circumstances do not support a reasonable inference of discrimination if the Court "would have to 'speculate' to 'fill in the gaps'" regarding the employer's motive. *See Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020) (quoting *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 586 (4th Cir. 2015)).

Here, the only reasonable inference supported by the record is that Plaintiff was terminated because of her deficient performance of ultrasound examinations. To agree with Plaintiff's position that the corrective actions and quality assessments were based on disability discrimination—again, based on nothing more than Plaintiff's conclusory allegations in the complaint—would require the Court to improperly speculate about the motivations of multiple actors across at least a dozen incidents over the course of a year. *See Kelly*, 90 F.4th at 170 (finding that the plaintiff "fail[ed] to connect the dots" that he was discriminated against because of his disability when the complaint's allegations supported an inference that any mistreatment was because of "personal and political conflicts," not his disability). Indeed, "to find that [Defendant] 'was motivated by [Plaintiff's] disability,' [the Court] would have to ignore the only 'reasonable inference' that the record sufficiently demonstrates": Kaiser terminated Plaintiff because her ultrasound exam performance did not meet Kaiser's standards and put patients and radiologists at risk. *See Sigley v. ND Fairmont LLC*, --- F.4th ---, No. 23-2013, 2025 WL 568671, at *3 (4th Cir. Feb. 21, 2025) (citing *Kelly*, 90 F.4th at 169–71) (finding that the only reasonable inference the court could draw from the record was that the defendant-employer fired the plaintiff because he

was dishonest). As such, there is no genuine dispute that Plaintiff was not meeting the legitimate expectations of her employer at the time of discharge and the uncontested record does not support an inference that plaintiff was terminated in whole or in part because of her disability. She therefore has failed to make a prima facie case of disability discrimination.

Even if Plaintiff had established a prima facie case of discrimination under the ADA, she has not sufficiently rebutted Defendant's proffered legitimate nondiscriminatory reason for her termination under the *McDonnell Douglas* framework. Defendant has amply met its burden of production that Plaintiff was discharged due to performance issues rather than Plaintiff's disability. *See* ECF 27-8, at 23–24, 28–30, 32–33, 35–36, 38, 50–53, 55–57, 72–73, 83–87, 95–96, 102–03, 221–23, 225–31; ECF 27-9, at 2–7, 16–21, 25. Plaintiff has offered no evidence at all to rebut this legitimate nondiscriminatory reason for her termination. Plaintiff responds only with the broad assertion that "if [her performance] appraisals were based on the underlying discrimination, they cannot be used to support a lawful termination." ECF 30, at 4. Plaintiff's position misapprehends both the summary judgment standard and substantive ADA law. First, as noted, Plaintiff has failed to point to any record evidence to establish a dispute of material fact. Plaintiff relies only on the allegations in the complaint in attempting to defeat summary judgment, assuming to be true the merits of the discrimination claim. *See id.* Second, even if Plaintiff had presented evidence establishing that there was a discriminatory reason for Defendant's decision to terminate Plaintiff, this alone would not suffice to defeat summary judgment on a discrimination claim under the ADA. The discriminatory reason must be "more than *a* motivating factor: it must be *the only* motivating factor." *Davis v. W. Carolina Univ.*, 695 F. App'x 686, 688 (4th Cir. 2017) (emphasis in original) (citing *Gentry*, 816 F.3d at 235). "If an employer acts with a mixed motive—both a discriminatory and non-discriminatory reason—then the employer is not liable." *Id.*

20

As such, there is no dispute of material fact and Defendant is entitled to summary judgment on the disability discrimination claim as a matter of law.

## B.    Plaintiff's ADA Retaliation Claim

To succeed on a retaliation claim brought under the ADA, a plaintiff must show: "(1) she has engaged in protected conduct; (2) she suffered an adverse action after engaging in the protected conduct; and (3) there was a causal link between the protected conduct and the adverse action." *Laird*, 978 F.3d at 892 n.4 (quoting *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006)).

"[P]rotected activity includes opposing any act or practice by the employer that violates the ADA and pursuing rights guaranteed by the statute[.]" *LeBarron v. Interstate Grp., LLC*, 529 F. Supp. 3d 1163, 1173 (D. Nev. 2021) (citing *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004)); *see also* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."). "[A] plaintiff is not required to prove the conduct he opposed was actually an ADA violation. Rather, [s]he must show [s]he had a 'good faith belief' the conduct violated the ADA." *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012) (quoting *Freilich v. Upper Chesapeake Health,* 313 F.3d 205, 216 (4th Cir. 2002)). An adverse employment action is one that adversely "affect[ed] employment or alter[ed] the conditions of the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006). Termination is an adverse employment action. 42 U.S.C. § 12112(a) (prohibiting discrimination against qualified individuals on the basis of disability in certain employment actions, including the "discharge" of employees); *see also Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (citing "firing" as an example of an adverse action).

21

As an initial matter, Defendant is correct that the Fourth Circuit has squarely held that filing a workers' compensation claim is not protected activity under the ADA. *See Reynolds*, 701 F.3d at 154 ("Filing a workers' compensation claim is not something that is covered by the ADA, but rather by retaliation provisions under state law. . . . Thus, [plaintiff's] retaliation claim based on his workers' compensation request likewise fails."). Beyond that, Plaintiff asserts that "Plaintiff's allegation to her supervisor that she felt targeted and *harassed* is more than a general complaint of unfair treatment. It is a specific complaint that she felt harassed and is a protected activity under the ADA." ECF 30, at 5 (emphasis in original). The record evidence belies this contention.

When considering whether a particular action constitutes a protected activity the Court must first examine whether the employee "communicate[d] to her employer a belief that the employer has engaged in . . . a form of employment discrimination." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009). "If this first question is answered in the affirmative, then a court considers whether this communicated belief concerns a practice that is 'actually unlawful under [the statute]' or that the employee 'reasonably believes to be unlawful.'" *Bowman v. Balt. City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 248 (D. Md. 2016) (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015)).

Simply stated, if Plaintiff was merely complaining of general "unfair treatment" to Hollis, her complaint will not constitute a protected activity. *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 588 (D. Md. 2012); *Harris v. Md. House of Corr.*, 209 F. Supp. 2d 565, 570 (D. Md. 2002). However, "where the employer understood or should have understood that the plaintiff opposed an unlawful practice, that opposition is protected activity." *Bowman*, 173 F. Supp. 3d at 248 (citing *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012)).

Here, Plaintiff's March 2020 email—sent in response to her being removed from OB ultrasounds at the request of a radiologist and after numerous documented deficiencies performing such exams—explicitly noted that she felt "targeted and harassed for doing [her] job," and related it to "the measures that were taken against [her] with the most recent incident with a testicular case." ECF 27-9, at 32. Nothing in this email, nor the reference to the quality assessment of the scrotal ultrasound exam, would or should leave her employer understanding that Plaintiff was opposing an action she believed to be in violation of the ADA. Plaintiff's earlier complaints to her union representative, *see* ECF 27-3, at 41–42, also are not sufficient to be protected activity, as it does not appear these complaints ever made their way to Plaintiff's actual employer. Even if they did, they would seem to fall well outside the 300-day window. *See Valderrama v. Honeywell Tech. Sols., Inc.*, 473 F. Supp. 2d 658, 662 (D. Md. 2007) (explaining that in Maryland, which is a deferral state, a plaintiff must file a charge of discrimination within 300 days of allegedly discriminatory conduct), *aff'd*, 267 F. App'x 256 (4th Cir. 2008). Thus, these complaints are not sufficient to establish a prima facie claim of retaliation under the ADA.

Even if Plaintiff's taking of FMLA leave constitutes protected activity under the ADA, Plaintiff has not established that the FMLA leave is causally linked to her termination. Any temporal connection is tenuous at best, as Plaintiff had been taking intermittent FMLA leave for years, up until April 2020, before her termination in June 2020, with disciplinary actions intermittent during this same period too. The Fourth Circuit has held that "a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Horne v. Reznick Fedder & Silverman,* 154 F. App'x 361, 364 (4th Cir. 2005) (quoting *King v. Rumsfeld,* 328 F.3d 145, 151 n.5 (4th Cir. 2003)). And an inference of causation due to temporal proximity is undercut by evidence that the employer was

"contemplating" the adverse action "before it learned of" the protected activity. *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 272 (2001).

Even if Plaintiff had stated a prima facie retaliation claim, her claim would still fail at this stage under the *McDonnell Douglas* framework for the same reason as her discrimination claim does: she has not presented any evidence to rebut Kaiser's proffered legitimate, nondiscriminatory basis for terminating Plaintiff. For these reasons, summary judgment will be granted in favor of Kaiser on Plaintiff's retaliation claim.

### C.    Plaintiff's Hostile Work Environment Claim

"A hostile environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). In order to succeed on a hostile work environment claim under the ADA, a plaintiff must show that "(1) [s]he is a qualified individual with a disability; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on [her] disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001). "While the [unwelcome harassment element] is subjective, the rest of the test is made up of objective components based on a 'reasonable person' standard." *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). For the third element, the plaintiff must establish that her disability was a but-for cause of the alleged harassment. *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 723 (4th Cir. 2007).

Plaintiff appears to base her hostile work environment claim entirely on the disciplinary actions she faced. *See* ECF 1, at 7 ¶ 46 ("On account of her disability and engagement in protected activity, Plaintiff Ms. Fraser was subjected to unwelcome harassing treatment in the form of unjust discipline, administrative leave, constructive and ultimately actual termination of her employment."). Plaintiff acknowledged during her deposition that the only time Hollis or anyone else mentioned her disability were those times Hollis asked how Plaintiff's treatment helped her. *See* ECF 27-3, at 73–77. These questions, standing alone, are far from severe or pervasive. And again, there is nothing in the record to support an inference that the disciplinary actions, which were often prompted by people other than Hollis, were motivated in any way by Plaintiff's disability. Plaintiff has not established that her disability was a but-for cause of any action taken, and she has not established the elements of a hostile work environment claim. *See Rock v. McHugh*, 819 F. Supp. 2d 456, 471–72 (D. Md. 2011) (entering summary judgment for defendant on hostile work environment claim because "[t]he record reflect[ed] no instance where [p]laintiff's supervisors could be characterized as having threatened or humiliated [plaintiff]" and "[p]laintiff cite[d] no situation where his supervisors made any offensive utterances regarding his alleged disability"). As such, the Court need not address Defendant's *Ellerth/Faragher* affirmative defense. Defendant is entitled to summary judgment on the hostile work environment claim.

IV.   **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is granted. A separate implementing order will issue.


Dated: March 10, 2025                                    /s/
                                                Brendan A. Hurson
                                                United States District Judge


25